O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER BERMAN and HEIDI BERMAN, | CASE NO. SACV 08-1051 DOC (RNBx) |
| Plaintiffs, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| AMEX ASSURANCE COMPANY and DOES 1 through 50, inclusive, | |
| Defendants. | |
| _____ | |
| AMEX ASSURANCE COMPANY, | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| JOANNA KLASS dba TOUCH OF KLASS, | |
| Third Party Defendant. | |
| _____ | |

## I.    Background

This cause came for trial on February 2, 2010, February 3, 2010, and February 24, 2010, before the Court sitting without a jury, as to Plaintiffs Christopher Berman and Heidi Berman ("Plaintiffs" or the "Bermans") claims against Defendant AMEX Assurance Company

("Defendant" or "AMEX") for breach of contract, declaratory relief, and breach of the implied covenant of good faith and fair dealing and Defendant and Third-Party Plaintiff AMEX's claims against Third Party Defendant Joanna Klass dba Touch of Klass ("Third Party Defendant" or "Klass") for indemnification and subrogation.  The Court, having heard the testimony and having examined the proofs offered by the respective parties, the cause having been submitted for decision, and the Court being fully advised in the premises, makes its finding of fact and conclusions of law as follows:

II.     **Findings of Fact**

1.      The Bermans own a single-family residence located at 25321 Abilene Court, Laguna Hills, CA 92653 that was constructed in 1989 (the "house"). The residence is approximately 4,493 square feet, and has five bedrooms and four and one half bathrooms.  Trial Ex. 11 at 1.  The residence uses stucco and tile roof on the "exterior facade" and the "interior facade consists of drywall."  *Id.*

2.      The Bermans purchased the house on October 17, 1991, which had been used as a model home between 1989 and 1991.  (Trial Tr., dated February 2, 2010, Vol. I, 27:8-17.)  When the Bermans purchased the house, it sat on a lot that was one-third of an acre in size.  *Id.* at 26:11-19.

3.      The house has wood-framed windows on the front and back elevations, and aluminum-framed windows on the side elevations.  *Id.* at 27:8-17.  Wood windows at the residence, primarily on the front and back elevations, use a style of framing manufactured by Pozzi, Inc. and are hereinafter referred to as the "Pozzi windows."  Pozzi windows, unlike more conventional windows, are "nail on units" such that the window panes adhere to the wood frames in which they are housed.  Trial Ex. 2 at 2.  As a result, the window panes must be removed from the frames only after disassembling the frame pieces at the interlocking mortise-and-tenon joints.  Trial Tr., dated February 3, 2010, Vol. II, at 77:15-78:5.  Some of the wood framed

1    windows are "fixed" and others are "crank windows."  Trial Tr., dated

2    February 3, 2010, Vol. I, at 12-13.  The window panes are held by glazing

3    stops that cannot be unscrewed.  *Id.* at 14-15.

4    4.    There are seven aluminum framed windows on the second floor, six

5          aluminum framed windows on the first floor, twelve wood framed windows

6          on the second floor, and four wood framed windows on the first floor.  *Id.* at

7          29-30.  There is evidence of "fogging" to various windows, whereby "the

8          hermetic seal that is between the two panels of glass has been ruptured and

9          moisture or vapor" has developed "in between the panels."  *Id.* at 34:14-17.

10   5.    The Bermans caused damage to the windows in the residence between 1991

11         and 2006.

12   6.    For instance, a window in Bermans' formal dining room "looks like it was

13         attacked with an Airsoft gun," which is probably because at least one of the

14         Bermans' sons has "pellet guns or Airsoft guns."  Trial Tr., February 2,

15         2010, Vol. II, at 17:15-25.  Certain windows that "face into a little patio or

16         little courtyard area" as well as certain windows "going across the

17         backyard" have suffered from water damage.  *See id.* at 38:1-7.

18   7.    Mr. Berman caused minor damage to windows embedded in and around the

19         master bedroom's French doors.  In 1995, Mr. Berman replaced a wood

20         framed window in the second-floor master bedroom with two adjoining

21         French doors with embedded windows — and two side lights — that

22         opened up to a wood deck that was installed one year later.  Trial Tr., dated

23         February 2, 2010, Vol. II, at 13:13-14:22; *see also id.* at 26:3-9.  Mr.

24         Berman testified that none of the windows embedded in the French Doors,

25         or the adjacent side lights, were scratched or otherwise damaged during

26         installation.  *Id.*  He testified that he applied stucco around the newly

27         installed doors and side lights, but taped blue plastic to the edges of the

28         glass in and around the doors that was not removed "until after the stucco

3

1    and work was done." *Id.* at 27:3-5.  However, Mr. Berman admitted to

2    using windex and a paper towel to clean the glass in the doors and side

3    lights soon after their installation. *Id.* at 27:9-10.

4    8.    Between 1993 and 1995, Mr. Berman attempted to apply tint to two

5    windows: (1) a "little rectangular window" located "[i]n the upstairs master

6    bathroom [] water closet"; and (2) a window in one of his sons' rooms. *Id.*

7    at 35:3-9.  In order to apply tint to the windows, Mr. Berman applied "a big,

8    slippery sheet of plastic that you put on wet." *Id.* at 35:16-19.  The project

9    failed because the sheet of plastic "bubbled" when affixed to the windows,

10    and Mr. Berman ultimately decided "it was not a task that was meant for

11    me." *Id.* at 35:10-11.  It is unclear from Mr. Berman's testimony whether

12    the "bubbled" sheet of plastic remains affixed to the two windows.

13    9.    Finally, one of the Bermans' sons applied a "bluish" film to a window that

14    is "by the shower" in order to "obscure view into the shower." *Id.* at 35:21-

15    36:4.

16    10.    In 1995, Mr. Berman converted a bonus room in the residence into a

17    bedroom with limited help from a friend. *Id.* at 25:11-17.  This project

18    involved the erection of dry wall at some distance from the window. *Id.*

19    11.    Mr. Berman also "painted" the stucco around the windows of the residence

20    on at least two occasions. *See id.* at 31:19-20 (clarifying prior testimony

21    about window frames and stating that "I did not paint the window frames.  I

22    painted the stucco.").  When the Bermans first moved into the residence,

23    Mr. Berman painted the interior window frames of the house. *See id.* at

24    29:20-30:3, 31:2-4.  He thereafter painted the interior frames of the

25    windows in the residence's family room at some time between 2002 and

26    2010. *Id.* at 30:7-10.  He also painted the exterior frames of the windows

27    on one occasion in or about 2000, though he could not recall the exact date.

28    *Id.* at 30:11-24, 31:5-11.  He "papered and taped" the windows in order to

1   prevent the fresh paint applied to the stucco from seeping on to the window
2   frames or panes. *See id.* at 32:17-22. Despite these efforts, Mr. Berman
3   admits "[t]here is some residue paint on some of the wood windows in the
4   formal dining room and living room." *Id.* at 33:24-25.

5   12.   In addition to home improvement work, Mr. Berman also washed the
6         windows of the house between 1991 and 2004, and, in particular, after he
7         repainted the stucco surrounding the windows. He used a device that he
8         credibly described as "a sheepskin fur[r]y thing that I would dip into a
9         soapy container." *Id.* at 27:11-16. Mr. Berman used this device to "wash or
10        rub the window" and then proceeded to "take a squeegee" to wipe off the
11        soapy water and other residue on the window pane. *Id.* at 27:13-20. The
12        device and squeegee are not the same, though they have similar shapes.
13        Both were purchased between 1995 and 2000. *Id.* at 28:23-25.

14  11.   Mr. Berman washed the windows by removing the screen to the windows
15        and cleaning the inside pane of the windows. On occasion, Mr. Berman
16        would also clean the outside pane of the windows. In order to clean the
17        outside panes of windows on the upper level of the house, Mr. Berman
18        would use the built-in sliders to "remove the side windows, and then []
19        reach out through the open window and get the window in the center." *Id.*
20        at 33:-9-12.

21  12.   Mr. Berman left the country in February 2004. *Id.* at 27:24-28:2. He did
22        not clean the windows in the residence between that date and November 11,
23        2006, the date of the conduct that gives rise to this lawsuit. *Id.* at 28:3-6.

24  13.   In November 2006, a friend of the Bermans hired third-party defendant A
25        Touch of Klass ("TOK") to provide cleaning services for the Bermans.
26        There is no evidence in the record as to whether either the Bermans, or their
27        family friend, discussed the provision of window-cleaning services. Trial
28        Tr., dated February 2, 2010, Vol. I, at 33:12-17.

5

14.    A team of individuals from TOK first arrived to clean the Bermans' residence on November 11, 2006. *Id.* at 32-35. One of the individuals began washing the glass windows and doors. *Id.* at 35. Soon after the individual started this project, Ms. Berman left the residence to go to her workplace. *Id.* at 38-41. When Ms. Berman returned home, she observed scratches on almost every pane of glass in the house. *Id.*

15.    Some of the windows in the Bermans' residence bear scratches. Those scratches "vary in that they occur in all different positions." *See* Trial Ex. 11 at 3; *see also, e.g.*, Trial Ex 25 (bathroom window with both vertical and diagonal scratches); Trial Ex. 104 (horizontal scratch on unidentified window); Trial Ex. 108 (similar). The scratches also vary in terms of their girth. *Compare* Trial Ex. 111 (thick scratches), *with* Trial Ex. 121 (narrow scratches). There are some visual consistencies between the scratches. *Compare* Trial Ex. 111, *with* Trial Ex. 122 (scratches of similar size).

16.    Ms. Berman contacted Ms. Joanna Klass, owner of TOK, the next day to complain about the scratches. *Id.* at 42. Ms. Berman also complained about other concerns she had about TOK's service, including the potential theft of personal items and clothing. *See id.* Ms. Berman continued to receive TOK's services for another one and one half year. *Id.* at 33:12-17.

17.    Ms. Klass visited the Bermans residence within the next week, apologized for the scratches, and agreed to compensate the Bermans for the damage to the extent practicable. *See id.* at 42, 62. Ms. Klass' attempt to enter into a compromise with Ms. Berman is inadmissible for the purpose of determining liability. Fed. R. Evid. 408.

18.    AMEX has admitted that "[o]n or about November 11, 2006 . . . a house cleaning service attempted to clean windows at the Property. In the process, the house cleaning service nicked, scored, gouged, scraped, scuffed, abraded and/or scratched virtually every pane of glass at the

1    Property."  Docket 25 ¶ 8 (admitting Ex. A to Docket 1, ¶ 8).  That

2    admission is not binding upon TOK in AMEX's separate action for against

3    TOK.  *See Sekaquaptewa v. MacDonald*, 575 F.2d 239, 247 (9th Cir. 1978).

4    19.   The preponderance of the evidence does not establish that TOK caused the

5          scratches to the windows at the Bermans' residence for three reasons.

6    20.   First, the disparity between the patterns, girth, and angles of the scratches

7          on the windows undermines the suggestion that TOK caused the scratches.

8          Trial Tr., dated February 3, 2010, Vol. II, at 69:14-18 ("There were no

9          specific patterns.  The scratches that I did observe were at different angles,

10         at different orientations."); *see also id.* at 93:15-20 (same).  There is no

11         evidence that TOK's employees used multiple cleaning tools capable of

12         creating the different types and patterns of scratches observable on the

13         windows in the residence.  In addition, photographs of the windows taken at

14         or around the time this lawsuit was filed show that some of the scratches

15         have expanded, while others have not, even on the same windows.  *See*

16         Trial Ex. 25 (different scratches and streaks of different ages).

17   21.   Second, though Ms. Berman testified that she had never seen the scratches

18         prior to November 11, 2006, it had been more than two years since the

19         windows had last been cleaned, and the accumulated dirt and dust likely

20         concealed pre-existing scratches and other blemishes.  *See* Trial Tr., dated

21         February 2, 2010, Vol. II, at 28:3-6.  Ms. Berman is a credible witness, but

22         her attribution of the scratches to TOK's conduct on November 11, 2006

23         likely results from the fact that her ability to view pre-existing scratches had

24         been obstructed by accumulated dirt prior to that date.  For instance, TOK's

25         expert witness Mr. Steve Clements credibly testified that the vast majority

26         of the scratches on the Bermans' windows were only visible after he

27         cleaned the windows during his November 6, 2009 inspection of the

28         residence.  *See* Trial Tr., dated February 3, 2010, Vol. II, at 62-65.

7

22. Third, the nature of the Bermans' home improvement activity prior to that date also undermines the likelihood that TOK's conduct caused the scratches to the windows.  Between striking the windows with toy gun pellets, partially tinting some of the windows, re-painting the window frames, causing cracks to the windows, and using two cleaning devices on the windows, it is likely that the Bermans caused the scratches to the windows.

23. Fourth, some of the windows were located adjacent to trees or other shrubbery growing around the exterior of the house.  *See* Trial Exs. 16, 20, 21, 111, 116, 117, 118, 119, 120.  The outside panes of the windows came into contact with the trees and shrubbery growing around the exterior of the house.

24. It was AMEX's burden to prove that TOK's negligence caused the scratches observable on the windows in the Bermans' residence.  Instead of carrying this burden, AMEX relies on the doctrine of *res ipsa loquitur*, which holds that "[w]here the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of proper care."  *Zentz v. Coca Cola Bottling Co.*, 39 Cal.2d 436, 441 (1952).  AMEX argues that "it is probable that the washing of windows will cause scratches only if proper case is not used."  Docket 75 ¶ 24.  However, in this case, AMEX has not shown, by a preponderance of the evidence, that the windows in the Bermans' residence did not bear scratches prior to November 11, 2006.  In fact, the evidence is to the contrary.

25. Since November 11, 2006, the condition of the windows in the Bermans' residence has worsened.  First, the bottom ledge of an exterior window

8

frame of a family room window on the front of the house has been "badly deteriorated" by the discharge from a water sprinkler located on the Bermans' front lawn. Trial Tr., dated February 2, 2010, Vol. II, at 16:13-17:21. Second, a window in one of the bathrooms in the house has "some big cracks in it" that were not caused by Touch of Klass. *Id.* at 17:10-14. Moreover, there are cracks in windows in the dining room, the "upstairs bedroom," and the entryway to the residence. Trial Exs. 106-111. Finally, every wood framed window suffers from minor "sun and weather wear." *Id.* at 38:18-22.

26.   Ms. Berman received a March 5, 2007 written estimate prepared by a company called the Window Broker. Trial Tr., dated February 2, 2010, Vol. I, at 43:14-44:13. Ms. Berman has only preserved two pages: a cover letter and one page of the estimate. The cover letter summarizes "pricing" for the replacement of three categories of window panes: (1) "41 windows" at a cost of "$19,452"; (2) "4 patio doors" at a cost of "$7,736"; and (3) "4 french doors" at a cost of "$18,113." Trial Ex. 237.[1] One of the three measurement and pricing sheets — the only one still in Ms. Berman's custody — is dated February 9, 2007 and lists seventeen windows, their width and height, and the retail price of fixing each one. Trial Ex. 236.

27.   The Bermans later retained a Damage Consulting and Forensics company operated by an estimator named David Spiegel. Trial Ex. 13. Mr. Spiegel's estimate calculated the replacement cost of the window panes, but also added the costs of replacing the window frames. *Id.* at 1-2. In addition, the estimate calculated the costs of repainting the walls in the rooms in which windows would need to be replaced, re-glazing the replacement windows,

---

[1] The Bermans' hearsay objection to this estimate is overruled. *See United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999) (citing Fed. R. Evid. 803(6)).

9

1    and replace the stucco surrounding the windows that needed to be replaced.

2    *Id.* at 1-30.  The total estimated cost of cleaning, content manipulation,

3    general demolition, doors, drywall, electrical, permits and fees, finish

4    carpentry/trimwork, finish hardware, air circulation, labor, light fixtures,

5    plumbing, painting, scaffolding, stucco and exterior plaster, windows

6    replacement, window re-glazing, window repair, window treatment, and

7    wood windows was $142,869.00.  *Id.* at 30.[2]

8    28.    By contrast, a September 5, 2007 estimate prepared by Jim Buckley &

9    Associates, Inc., an insurance adjuster retained by AMEX.  Trial Ex. 2.  The

10    estimate was prepared following an August 15, 2007 inspection.  *Id.* at 2.  It

11    concluded that "a porous material was used to clean the windows" and

12    found "evidence of scratching on both the first and second floor windows of

13    the insured's home."  *Id.*  The estimated cost of repair was $43,766.51.  *Id.*

14    Another estimate, dated March 23, 2008, was prepared by Jim Buckley &

15    Associates Inc.  Trial Ex. 3.  It calculated similar costs relating to

16    appliances, cabinetry, cleaning, general demolition, doors, drywall,

17    electrical, floor covering — carpeting, floor covering — stone, floor

18    covering — ceramic tile, finish carpentry/trimwork, finish hardware,

19    framing and rough carpentry, air circulation, light fixtures, mirrors and

20    shower doors, interior lath and plaster, plumbing, painting, scaffolding,

21    stucco and exterior plaster, tile, aluminum window replacement, and

22    window treatment.  *Id.* at 29.  It estimated that such work would cost

23    $169,824.75.  *Id.*

24    29.    The windows and window frames have suffered further damage as a result

25    of this litigation.  At least one expert witness disassembled two wood-

26

27          [2] A subsequent estimate prepared by Allied Public Adjuster was not admitted into evidence.  It estimated a cost of $192,737.42 to replace the damaged window panes and

28    conduct other repairs in the process.  Trial Tr., dated February 3, 2010, Vol. I, at 35:2-3.

framed windows in connection with his analysis. *See id.* at 20.  He forced one of the windows back into place, which resulted in damage to the wood frames.  *Id.* at 21:9-12.  The second window — a "casement window" — "no longer crank[s] shut" and must be "push[ed] . . . close[] from outdoors." *Id.* at 22:4-9.  The damage to the casement window results from the fact that the top of the window frame now "strikes the casing before it does at the bottom . . . it no longer lines up."  *Id.* at 22:19-22.

30.  Defendant AMEX issued California Special Form Homeowners Insurance Policy No. HX01024387 (the "policy") to Plaintiffs, effective July 11, 2005 to July 11, 2006 (the "first policy period") for the risk located at 25321 Abilene Court, Laguna Hills, CA 92653.  The policy was renewed for the period of July 11, 2006 to July 11, 2007 (the "second policy period").

31.  The policy covers "physical injury to, destruction of or loss of use of tangible property" caused by "an accident which is unexpected or unintended from your standpoint" to the house "including structures attached to it, at the residence premises."  Trial Ex. 1-5.

32.  The policy in relevant part excludes from coverage "loss caused directly or indirectly by any of the following, whether or not any other cause or happening contributes concurrently or in any sequence to the loss: [. . .] neglect of an insured person to use all reasonable means to save or protect covered property at and after the time of loss, or if endangered by a loss we cover."

33.  The policy also excludes "loss resulting directly or indirectly from:

"3.  Faulty, inadequate or defective:

a)  construction, reconstruction, repair, remodeling or renovation;

b)  materials used on construction, reconstruction, repair, remodeling, or renovation;

c)  design, workmanship, specification;

11

1        d)      siting, surveying, zoning, planning, development, grading or
2                compaction; or
3        e)      maintenance of a part or all of the residence premises or any
4                other property;
5    "4.    Wear and tear; marring or scratching; deterioration; damage which
6           occurs over a period of time; or from lack of normal maintenance;
7           defective materials and workmanship; inherent vice; latent defect.
8           mechanical breakdown; fungus; mold; wet or dry rot; discharge,
9           dispersal or release of pollutants or contaminants; smog; smoke from
10          agricultural smudging or industrial operations; settling; cracking;
11          shrinkage, bulging or expansion of pavement, patios, foundations,
12          walls, floors, roofs or ceilings; birds, vermin, rodents, insects or
13          domestic animals.

14   34.    The policy's stated limit for coverage for the dwelling is $706,000.
15          Stipulated Fact; *see also* Trial Ex. 1-1.  The Bermans paid a premium of
16          $3,874.00 for that coverage.  *Id.*

17   35.    The policy also provides that "[i]f a covered loss makes your residence
18          premises uninhabitable, we will pay at your option, either: (1) the
19          reasonable increase in your living expenses necessary to maintain your
20          normal standard of living while your live elsewhere; or (2) the fair rental
21          value of the part of the residence premises where you reside, less any
22          charges and expenses which do not continue while the residence premises is
23          uninhabitable."  *Id.* at 1-7.  It continues that "[w]e will pay for the shortest
24          time needed: (1) to repair or replace the damaged property; or (2) for you to
25          permanently relocate."  *Id.*

26   36.    The policy also includes a section entitled "What to do in case of loss."  *See*
27          *id.* at 1-10.  It instructs the policyholder to give prompt notice, "protect the
28          property from further damage, making necessary and reasonable repairs to

                                        12

1    protect the property, and keeping records of the costs of repairs," and

2    "produce receipts for any increased costs to maintain your standard of

3    living while you reside elsewhere, and records pertaining to any loss of

4    rental income." *Id.*

5    37.   The section of the policy entitled "How losses are settled" in relevant part

6          reads:

7          "Covered property losses are settled as follows: Buildings

8          under Dwelling or Other Structures Coverages at replacement

9          cost without deduction for depreciation, subject to the

10         following:

11         a)    If, at the time of loss, the amount of insurance in this

12               policy on the damaged building is 80% or more of the

13               full replacement cost of the building immediately

14               before the loss, we will pay the cost to repair or

15               replace, after application of deductible and without

16               deduction for depreciation, but not more than the least

17               of the following amounts:

18               (i)    125 percent of the Dwelling Coverage limit of

19                      liability;

20               (ii)   the replacement cost of that part of the building

21                      damaged for like construction and use on the

22                      same premises; or

23               (iii)  the necessary amount actually spent to repair or

24                      replace the damaged building.

25         b)    If, at the time if [sic] loss, the amount of insurance in

26               this policy on the damaged building is less than 80% of

27               the full replacement cost of the building immediately

28               before the loss, we will pay the greater of the following

13

1    amounts, but not more than the limit of liability under

2    this policy that applies to the building:

3         (i)    the actual cash value of the part of the that [sic]

4                building damaged; or

5         (ii)   the proportion of the cost to repair or replace,

6                after application of deductible and without

7                deduction for depreciation, that part of the

8                building damaged, which the total amount of the

9                insurance in this policy on the damaged

10               building bears to 80% of the replacement cost of

11               the building.

12   . . . .

13   We will pay only the actual cash value of damaged property until actual

14   repair or replacement is completed.

15   We will not pay costs to repair or replace portions of a dwelling or other

16   structure not directly damaged by a covered peril in this policy, regardless

17   of replacement materials that reasonably match the existing materials on the

18   dwelling or other structure are no longer manufactured or otherwise

19   unavailable.

20   You may make a claim for loss on an actual cash value basis.  Then, within

21   180 days after the loss, you may claim any additional costs in accordance

22   with the replacement cost provision.

23   38.   The term "actual cash value" is defined in an amendment to the agreement:

24         Actual cash value is calculated as the amount it would cost to

25         repair or replace covered property, at the time of loss, with

26         material of like kind and quality, subject to a deduction for

27         deterioration, depreciation or obsolescence.  Actual cash

28         value applies to valuation of covered property regardless of

14

1           whether that property has sustained partial or total loss.

2    **III.**   **Conclusions of Law**

3        1.    The Bermans' complaint sets forth three claims for relief: (1) breach of

4            contract; (2) declaratory relief and (3) breach of the implied covenant of

5            good faith and fair dealing against AMEX.  By order entered on June 19,

6            2009, the Court granted AMEX summary judgment on the third claim for

7            relief for breach of implied covenant.

8        2.    The elements of a cause of action for breach of contract are: (1) the

9            existence of the contract; (2) performance by the plaintiff or excuse for

10          nonperformance; (3) breach by the defendant; and (4) damages.  *First*

11          *Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745, 108 Cal.

12          Rptr. 2d 23 (Ct. App. 2001).  "[W]hile insurance contracts have special

13          features, they are still contracts to which the ordinary rules of contractual

14          interpretation apply."  *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem.*

15          *Co.*, 9 Cal.4th 27, 37, 36 Cal. Rptr. 2d 100 (1995) (citations omitted); *see*

16          *also Conestoga Servs. Corp. v. Exec. Risk Indem.*, 312 F.3d 976, 981 (9th

17          Cir. 2002) (citing *La Jolla Beach*).  The parties have stipulated to the

18          existence of the insurance policy, and have stipulated that the Bermans "did

19          all, or substantially all, of the other significant things that the policy

20          required them to do."  Docket 71 at 4:9-11.

21        3.    To establish that AMEX breached the insurance policy, the Bermans must

22          first establish that the claim falls within the coverage grant of the AMEX

23          policy.  *See Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 406

24          (1989).

25        4.    This burden has been satisfied.  TOK was the only cleaning company to

26          visit the Bermans' residence on November 11, 2006, and AMEX has

27          admitted that TOK damaged virtually every window pane in the residence.

28          Findings of Fact ¶ 18.  This judicial admission is binding upon AMEX.  *See*

*Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226-27 (9th Cir. 1988). Requiring Plaintiffs to rebut evidence submitted by Klass would result in undue prejudice to Plaintiffs, who relied upon AMEX's Answer and on that basis did not conduct discovery as to the cause of damage to the windows.

5.    In the first party insurance context, "once the insured shows that an event falls within the scope of basic coverage under the policy, the burden is on the insurer to prove a claim is specifically excluded." *Garvey v. State Farm Fire & Cas. Co.*, 48 Cal.3d 395, 406, 257 Cal. Rptr. 292 (1989). Exclusions must be conspicuous, plain, and clear. *See Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 1189, 1204, 89 P.3d 381 (2004). "[E]xclusionary clauses are construed narrowly against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 648 (2003).

6.    "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal.4th 377, 390, 33 Cal. Rptr. 3d 562 (2005). The existence of an ambiguity is determined by reference to the surrounding context, including the policy and the operative facts. *See E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal.4th 465, 471, 9 Cal. Rptr. 3d (2004).

7.    AMEX argues that three exclusions in the insurance policy bar the Bermans' claim: (1) the "faulty maintenance" exclusion; (2) the "marring and scratching" exclusion; and (3) the "faulty workmanship" exclusion. It argues that the exclusions unambiguously apply to the alleged conduct — negligent window washing.

8.    AMEX's argument is barred by the law of the case. The law of the case doctrine provides that "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir.

16

1    1998) (quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.

2    1997)).

3    9.    In this case, the Court has already concluded that all three exclusions

4          identified by AMEX are ambiguous.

5    10.   The order on the motion to dismiss [Docket 15] found that the marring and

6          scratching exclusion could be reasonably interpreted to apply only "to

7          gradual damage or scratching and marring that the insured should otherwise

8          expect."  Docket 15 at 6.  The Court noted that "[t]he particular loss

9          suffered by the Bermans includes a degree of fortuity not clearly addressed

10         by the scratching and marring exclusion that, as the Bermans point out,

11         might reasonably be read by an insured to only reach more expected or

12         certain loss, especially when the exclusionary language couched between

13         other losses that occur gradually over an extended period of time."  *Id.*

14   11.   The Court suggested that the facial ambiguity of the exclusion could

15         eventually yield to extrinsic evidence to demonstrate the absence of an

16         ambiguity.  *Id.* at 6-7.  AMEX presented no extrinsic evidence at trial, and

17         chose to rest on the language in the policy, which this Court already found

18         was ambiguous as to damage that, AMEX admitted, occurred during the

19         policy term.  *Cf. Gerawan Farming Partners, Inc. v. Westchester Surplus*

20         *Lines Ins. Co.*, No. CIV F 05-1186 AWI DLB, 2008 WL 80711 (E.D. Cal.

21         Jan. 4, 2008).  The marring and scratching exclusion accordingly does not

22         bar the Bermans' breach of contract claim.  *Haynes*, 32 Cal.4th at 1204.

23   12.   The order on the motion to dismiss also concluded that the "faulty

24         workmanship" exclusion was ambiguous.  That order noted that, though the

25         "faulty workmanship" exclusion could be read to encompass "a faulty

26         process," it could also be read as restricted to "a faulty product."  *See*

27         Docket 15 at 7-8 (citing *Allstate Ins. Co. v. Smith*, 929 F.2d 447 (9th Cir.

28         1991)).  AMEX offered no extrinsic evidence at trial capable of disproving

1      the existence of this ambiguity, which is apparent from the language in the

2      policy.  The "faulty workmanship" exclusion accordingly does not bar the

3      Bermans' claim.

4    13.    The order on the motion to dismiss finally concluded that the "faulty

5      maintenance" exclusion was ambiguous.  Docket 15 at 8-9.  Noting the

6      "close question" of whether "cleaning constitutes an act of maintenance,"

7      the Court highlighted the absence of a definition of the term "maintenance"

8      in the policy.  *See id.*  On that basis, it held that a policyholder could

9      reasonably "read the term maintenance, in the context of window care, to

10      require more than the act of washing the windows" and that "the faulty

11      maintenance exclusion does not unequivocally bar loss resulting from

12      improper window-washing." *Id.* at 9.  AMEX presented no extrinsic

13      evidence at trial to disprove this ambiguity in the language of the policy.

14    14.    Instead, AMEX in essence requested reconsideration of the finding that the

15      term maintenance was ambiguous as to whether it covered the act of

16      cleaning.  It cites *Hamilton v. Associated Indem. Corp.*, in which the court

17      found that an exclusion for "faulty maintenance" unambiguously excluded

18      damage caused by a window scraper.  No. CV-07-141-N.-BLW, 2008 WL

19      711375, at *4-5 (D. Idaho March 14, 2008).  *Hamilton* distinguished the

20      Ninth Circuit's *Allstate* decision on the grounds that "unlike the term 'faulty

21      workmanship,' the term 'faulty maintenance' cannot be divided into

22      separate definitions for a faulty process and a faulty finished product." *Id.*

23      at *4.  It concluded that the damage caused by the cleaning service retained

24      to scrape construction residue from window panes was accordingly

25      excluded by the "faulty maintenance" policy language.  *Id.*

26    15.    *Hamilton* is unconvincing.  Even if "faulty maintenance" necessarily

27      implies a faulty process, the term is ambiguous as to the type of process.  In

28      *Schaber v. Allstate Ins. Co.*, the court held that damage caused by steam

1   cleaning a wood floor was not necessarily encompassed by a insurance

2   policy exclusion for "faulty maintenance."  No. C-06-6007 EMC, 2007 WL

3   4531707 (N.D. Cal. Dec. 18, 2007).  In this case, much as in *Schaber*, the

4   "faulty maintenance" exclusion is found in a paragraph that also excludes

5   damage caused by faulty "construction, reconstruction, repair, siting,

6   surveying, [and] grading."  *Compare* Trial Ex. 1, *with Schaber*, 2007 WL

7   4531707, at *12-13 (surrounding language of "planning, zoning,

8   development, surveying, siting, design, specifications, [and] construction").

9   Like the order on the motions to dismiss, the opinion in *Schaber* concluded

10  that a reasonable policyholder could conclude that "'maintenance' is an act

11  akin to development, repair, or construction, and not cleaning." *Id.* at *12.

16.  The order on the motions to dismiss accordingly remains effective, and the
     Court's conclusions about the ambiguity of the "faulty maintenance"
     language will not be reconsidered.  AMEX offered no extrinsic evidence at
     trial capable of rebutting the ambiguity identified in that order.  The "faulty
     maintenance" policy exclusion does not bar the Bermans' claim.

17.  Since the damage admitted by AMEX falls within the policy's coverage and
     no exclusion applies, the Court proceeds to determine the damages to which
     the Bermans are entitled.  The policy provides for "the replacement cost of
     that part of the building damaged for like construction and use on the same
     premises."[3]  It adds that "[l]oss for damage to glass caused by a Peril
     insured against will be settled on the basis of replacement with safety
     glazing materials when required by ordinance or law."  Trial Ex. 1-11.

18.  The term "replacement cost" is defined by the California Insurance Code as

---

[3] Both the Bermans and AMEX concede that no other provision in section 2 is
applicable.  The amount to replace the windows is, without dispute, less than 125 percent
of the coverage limit.  And the Bermans have, in accordance with the policy, taken no
efforts to actually replace the windows.

1    "the amount that it would cost the insured to repair, rebuild, or replace the

2    thing lost or injured, without a deduction for physical depreciation, or the

3    policy limit, whichever is less."  Cal. Ins. Code § 2051.5(a).  Such a

4    provision generally goes "beyond the concept of indemnity and simply

5    recognizes that even expected deterioration of property is a risk which may

6    be insured against."  *Conway v. Farmers Home Mut. Ins. Co.*, 26 Cal. App.

7    4th 1185, 1189 (1994).

8    18.    AMEX has admitted that "virtually every" window pane in the Bermans'

9    residence was "nicked, scored, gouged, scraped, scuffed, abraded and/or

10    scratched" on November 11,2006.  Docket 25 ¶ 8 (admitting Ex. A to

11    Docket 1, ¶ 8).  The Bermans' expert, Mr. David Spiegel, testified that he

12    noticed scratches on "each and every window" when he inspected the house

13    in November 2009.  Trial Tr., dated February 3, 2010, Vol. I at 7:1-4.  He

14    determined that the aluminum framed window panes could be replaced and

15    the windows re-glazed.  *Id.* at 87:3-11.  However, according to Mr. Spiegel,

16    the scratched panes cannot be removed from the wood-framed windows

17    because (1) the panes cannot be removed without disassembling the pieces

18    of the frame; and (2) the wood frames have swollen as a result of exposure

19    to coastal air.  *Id.* at 76-79.  Mr. Spiegel concluded that it would cost

20    $142,869.00 to re-pane and re-glaze the aluminum frame windows, replace

21    entirely the wood-frame windows, and perform associated tasks, including

22    replacement of surrounding stucco, and re-painting affected areas.  Trial Ex.

23    13.

24    16.    Though Mr. Spiegel's conclusions about the aluminum framed windows

25    were credible and shared by TOK's expert witness, his conclusions about

26    the wood framed windows were not.  Mr. Spiegel did not contact Pozzi's

27    successor-in-interest, Jeld-Wen, to "get their recommendation as to how

28    they believe you could go about repairing or replacing the glass in a Pozzi

20

window." Trial Tr., dated February 3, 2010, Vol. I, at 15:6-10. He had no recollection of "ever personally replac[ing] glass in a Pozzi window," and estimated the cost of that procedure by examining a "comparable window" instead of an actual Pozzi-style window. *Id.* at 6:4-6; 14:7-14.

17. By contrast, Mr. Clements actually contacted Jeld-Wen and has experience replacing glass in Pozzi windows. *Id.* at 43:9-13; 71:4-6. He agreed with Mr. Spiegel that the aluminum framed windows could be re-paned and reglazed. As to the wood-framed windows, Mr. Clements offered three possible solutions, one of which appears to be the best estimate of the "reasonable cost" to repair the damage that AMEX admits occurred on November 11, 2006.

18. First, Mr. Clements testified that the vast majority of scratches on the wood-framed windows could be "buff[ed] out." *Id.* at 71:14-18. However, this remedy is insufficient to meet AMEX's contractual obligation to reimburse the "replacement cost" of the damaged property. Trial Ex. 1-11.

19. Second, Mr. Clements testified that "internal components of [some of the] windows" could be removed, thus "leav[ing] the permiter case frame intact up against the stucco" prior to installing "what is called a black frame internal-framed window." Trial Tr., dated February 3, 2010, Vol. II, at 73. However, he conceded that those windows "would look different" from the windows presently used by the Bermans, thus frustrating the purpose of the replacement cost obligation in the policy. *Id.*

20. Third, Mr. Clements concluded that "[t]he other repair obviously would be to remove the insulated glass unit and install a new one. . . . The particular boot-laced system that is in the Berman residence can be removed . . . it's just a matter of disassembling the rails and styles and installing a new insulated glass unit." Trial Tr., dated February 3, 2010, Vol. II, at 72:3-14. He concluded that this process, if conducted on all of the windows at the

1    Bermans' residence "whether scratched or not," would cost $15,263.41.  *Id.*

2    at 75:3-6.

3    21.   This was the only credible estimate of "replacement cost" at trial — the

4          damaged panes can be replaced without full replacement of the window

5          frames.  Contrary to the arguments made by the Bermans' expert witnesses,

6          the simple fact of damage to some of sash panel frames does not support the

7          conclusion that every frame in the residence must be replaced.  The

8          Bermans note that one of their expert witnesses retained a professional

9          window repair service to remove two of the wood frames, and found that

10         the frames, saturated by the ocean air, had trouble "fitting [] back in[],"

11         such "that the window was taken apart and hammered back together [and]

12         doesn't close by itself."  Trial Tr., dated February 3, 2010, Vol. II, at 80:1-

13         6.  However, this concern is particular to the casement window, and Mr.

14         Clements' testimony suggests that a more careful process can solve the

15         problems identified by Mr. Spiegel.

16   22.   Even if it did, the policy specifically instructed the Bermans to "protect the

17         property from further damage, making necessary and reasonable repairs to

18         protect the property, and keeping records of the costs of repairs," which did

19         not occur here as the window frames suffered at least partially as a result of

20         neglect.  Trial Ex. 1-10.  Moreover, the policy specifically excludes

21         coverage for "water damage," which includes "surface water, waves [or]

22         spray from any of these."  *Id.* at 1-9.  The Bermans concede that the damage

23         suffered by some of the wood window frames resulted from ocean air and

24         exposure to a sprinkler that was accidentally directed at the front entrance

25         of the residence.

26   23.   The Court accordingly finds that Mr. Clements' $15,263.41 estimate to be

27         the best approximation of the "replacement cost" of the parts of the

28

residence that AMEX admitted were damaged on November 11, 2006.[4] Those are the damages to which the Bermans are due on their claim for breach of contract.

24. However, AMEX's judicial admission does not bind TOK.  AMEX has not proved by a preponderance of the evidence that TOK's negligence caused the scratches observable on most of the window panes in the Bermans' residence.  To the contrary, it is more likely than not that the Bermans caused scratches to the windows, in light of the varying patterns and the type of home improvement and recreational conduct that the Bermans engaged in before November 11, 2006.

25. Judgment is accordingly entered in favor of the Bermans and against AMEX for $15,263.41 on their claims for declaratory relief and breach of contract.  AMEX shall bear the Bermans' costs.

26. Judgment is entered in favor of TOK and against AMEX on AMEX's third party claim for indemnification.  AMEX shall bear TOK's costs.

27. Any conclusion of law erroneously labeled herein as a finding of fact shall be deemed a conclusion of law.  Any finding of fact erroneously labeled herein as a conclusion of law shall be deemed a finding of fact.[5]

IT IS SO ORDERED.

DATED: February 22, 2011

_David O. Carter_
_____
DAVID O. CARTER
United States District Judge

---

[4] It is immaterial that Mr. Clements was called by TOK and not AMEX.

[5] TOK's motion for judgment as a matter of law is stricken as moot.